UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


LOREN REGELIN,

          Petitioner,

                                      CASE NO. 04-CV-70814-DT

v.                                   HONORABLE BERNARD A. FRIEDMAN

ANDREW JACKSON,

          Respondent.

_____/

## OPINION AND ORDER DENYING PETITION
## FOR WRIT OF HABEAS CORPUS

**I.**     **Introduction**

Loren Regelin ("Petitioner"), a state prisoner currently confined at the Carson City Correctional Facility in Carson City, Michigan, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 asserting that he is being held in violation of his constitutional rights.[1]  Petitioner was convicted of conspiracy to deliver more than 225 grams but less than 650 grams of cocaine, *see* Mich. Comp. L. §§ 750.157a; 333.7401(2)(a)(ii), following a jury trial in the Muskegon County Circuit Court in 1997.  He was sentenced to life imprisonment as a repeat drug offender.  *See* Mich. Comp. L. § 333.7413(1).

In his pleadings, Petitioner raises claims alleging a conflict of interest by trial counsel, insufficient evidence of conspiracy, improper jury instructions, and ineffective assistance of trial

_____

[1]At the time he instituted this action, Petitioner was confined at the Macomb Correctional Facility in New Haven, Michigan.

1

and appellate counsel.  For the reasons set forth below, the Court denies the petition for writ of habeas corpus.

## II.   <u>Facts and Procedural History</u>

Petitioner's convictions stem from his actions in conspiring to deliver more than 225 grams but less than 650 grams of cocaine in Muskegon County, Michigan in 1995 and 1996. Named but unindicted co-conspirators included Joe or Jose Gonzales, David Love, John Workman, Gerald Magnusen, Thomas Nutt, Raymond Alexander, and Brad Botbyl.

At trial, one of the main prosecution witnesses was David Love, an associate of Petitioner's who turned informant following his own arrest on drug charges on July 25, 1996. David Love testified pursuant to a plea agreement in which he pleaded guilty to cocaine possession and agreed to cooperate with the authorities and the prosecution agreed not to charge him as a habitual offender and granted him immunity for drug activity prior to July, 1996.  Love admitted that he had pleaded guilty to prior drug charges, cooperated with the authorities, and served time in jail.

Love testified that he knew Petitioner for 15 years but had not seen him for a time before running into him at area bars in 1995.  Petitioner asked Love if he wanted to get back into the drug business.  Love initially declined because he was married and had kids.  Following a divorce, Love changed his mind and told Petitioner that he was interested in buying and selling cocaine.  Love did not use cocaine with Petitioner, but wanted to make money from sales.  Love and Petitioner exchanged phone numbers in November, 1995.  Love received cocaine from Petitioner in December, 1995.  At that time, Love met with Petitioner in his apartment and they discussed their arrangement.  Petitioner said that he would front the cocaine to Love who would

pay him after he sold it.  Petitioner told Love that he wanted to make money from the cocaine

sales.  They also discussed who was going to help Love sell the cocaine and Love mentioned

Gerald Magnuson in particular.

Love testified that he went to Grand Rapids with Petitioner one day in December, 1995.

They stopped at a phone booth where Petitioner made a call to make sure that the cocaine was

available.  They then drove to a bar called My Place and waited in the parking lot.  Another

vehicle pulled up and Petitioner got into that vehicle and left.  Petitioner returned a few minutes

later, got back into Love's car, and they left to drive back to Muskegon.  When they had driven a

few blocks, Petitioner asked Love to pull over, took out the cocaine, and used about 1/4 of a

gram.  Love indicated that a heavy user would use two 8-balls (six to eight grams or 1/4 of an

ounce) a week.  When they arrived in Muskegon, Petitioner gave Love one ounce and kept two

ounces.  Love returned to Grand Rapids with Petitioner in January, 1996 and a similar series of

events unfolded.  Love received two ounces of cocaine on that occasion.

Love continued to receive cocaine from Petitioner over the next several months.  Love

was not using cocaine, just selling it to buyers, including Gerald Magnuson, Tom Nutt, Greg

Schwing, Ray Alexander, and Brad Botbyl.  Love fronted cocaine to Magnuson, sold and fronted

cocaine to Nutt and Schwing, and sold cocaine to Alexander and Botbyl.  He sold ½ ounce to

Magnuson 10 times, ½ ounce to Nutt eight times, 3 ½ grams once or twice to Alexander, 8-balls

to Botbyl once or twice, and two or three 8-balls to Schwing 10 times.

Love recalled that Petitioner dropped off cocaine at Love's apartment on one occasion

toward the end of January, 1996.  Love also received cocaine from Petitioner at a nearby 7-

Eleven.  On most occasions, Love received two ounces of cocaine from Petitioner.  Love stated

that he received three ounces from Petitioner in March, 1996. Love also testified that he received from Petitioner while they were at the Someplace Else restaurant in February or March, 1996. Petitioner made a few telephone calls, met with someone who pulled up in the parking lot, and subsequently gave Love two ounces of cocaine, while keeping approximately four to five ounces of cocaine. Petitioner fronted Love the cocaine on each occasion. Once Love sold the cocaine, Love paid Petitioner $1,400 an ounce. Love had to be paid up on the last transaction before Petitioner would arrange another one.

Love testified that Petitioner had told him that his cocaine source was a man he met in prison named Joe Gonzales who lived in Grand Rapids. Petitioner told him that he was also supplying John Workman and Chris Crowell with cocaine and that he occasionally sold an ounce to Workman.

In March, 1996, Love switched suppliers because he was able to get cocaine for $1,000 an ounce from Greg Schwing who was buying from a source in Holland, Michigan. Petitioner contacted him once or twice to try to sell him cocaine, but Love refused. Love was arrested in July, 1996 carrying over $700 and an 8-ball of cocaine he had purchased from Schwing. He agreed to cooperate with the authorities and set up a drug buy from Petitioner.

David Love subsequently contacted Petitioner about purchasing more cocaine. On July 29, 1996, he met Petitioner at his shop and Petitioner told him to call at 4:00 p.m. Love and Petitioner exchanged telephone calls that afternoon and Petitioner said that he was unable to reach his supplier, but they agreed to meet at Morrow's restaurant and drive in separate cars to Grand Rapids. The calls were recorded by police. The police subsequently searched Love and his car, outfitted him with a recording device, and gave him $5,300 to buy four ounces of

4

cocaine.  Love then drove to Morrow's restaurant, waited for Petitioner, and followed him to Grand Rapids.  They stopped at a 7-Eleven and Petitioner left to speak with his supplier.  When Petitioner returned, he said that his supplier had one ounce and that he could get three more ounces if Love waited.  Petitioner left again and returned 10 or 15 minutes later.  Love then followed Petitioner to a nearby gas station, they drove around together for awhile, then Petitioner made a call and left again by himself.  When Petitioner returned, Love followed him to an apartment complex.  Love gave Petitioner money to buy the cocaine.  Petitioner went into the apartment complex, returned with the cocaine in a large bag, gave it to Love, and left.  Love turned the cocaine over to the police.  A tape of recorded conversation between Love and Petitioner regarding the terms of the drug buy was played for the jury at trial.

Several police officers also testified regarding the circumstances of David Love's arrest and his subsequent cooperation with the police, the surveillance of Petitioner and Love, and the July 29, 1996 drug buy.

Muskegon Police Detective Ken Wansten testified about the investigation and arrest of Petitioner.  He explained that Petitioner was not arrested until October 9, 1996 because David Love was assisting with other investigations.  Detective Wansten testified that he read Petitioner his *Miranda* rights and interviewed him after his arrest.  Petitioner admitted delivering four ounces of cocaine to David Love in Grand Rapids on July 29, 1996.  Wansten told Petitioner that the conspiracy charge encompassed other deals as well.  Petitioner told Wansten that he was a heavy user and that his main source of cocaine was in Grand Rapids.  Petitioner said that he would purchase two to four ounces per trip, that he made one to four trips a week, and that he had been buying cocaine for the past year.  He said that his main customer was David Love.  He

explained that he sold Love two to four ounces and sold John Workman two ounces per purchase. Petitioner supported his own habit through sales. He said that the most he ever purchased at one time was four ounces. He would not divulge the name of his Grand Rapids source. Based upon Petitioner's admission, Detective Wansten concluded that Petitioner would have purchased 104 ounces or 2, 912 grams of cocaine a year if he had bought only two ounces of cocaine each week. If he had purchased four ounces each week, he would have purchased 208 ounces or 5, 824 grams in one year.

Muskegon Police Detective Mark Baker testified as an expert witness in the area of cocaine use, possession, and distribution. He testified about his work with David Love during the investigation of Petitioner and explained the drug trafficking terminology on the taped recordings. For example, Detective Baker stated that he listened to a conversation between Love and Petitioner in which Love asked Petitioner, "Is Joe doing anything?" Petitioner replied, "yeah he is." Love said that they needed to get together and Petitioner told Love to call him the next day. Detective Baker explained that "doing anything" meant selling cocaine and was a common phrase in the narcotics business. He said that it was typical for the parties to a large drug transaction to have multiple contacts before the deal concluded. He also explained that a medium to heavy cocaine user would consume 1/8 to 1/4 of an ounce per week and that it would be unusual for a heavy user to consume an ounce a week. Detective Baker and a Michigan State Police analyst confirmed that the bag recovered from David Love on July 29, 1996 contained 111.9 grams of cocaine.

Petitioner did not testify at trial. At the close of trial, the jury convicted Petitioner of conspiracy to deliver more than 225 grams but less than 650 grams of cocaine. The trial court

subsequently sentenced him to life imprisonment as a repeat drug offender and to 20 to 45 years imprisonment as a second habitual offender.

Petitioner, through counsel, filed an appeal as of right with the Michigan Court of Appeals raising claims concerning the sufficiency of the evidence, prosecutorial misconduct, the jury instructions on the aggregation of cocaine amounts, and sentencing. Petitioner also filed a *pro se* supplemental brief raising claims concerning the trial court's jurisdiction, an amendment to the information, the lack of a jury instruction on co-conspirator credibility, the sufficiency of the evidence, and ineffective assistance of trial counsel for failure to investigate and challenge the conspiracy evidence. The Michigan Court of Appeals affirmed Petitioner's convictions and life sentence, but vacated the 20 to 45-year sentence. *See People v. Regelin*, No. 2203689, 1999 WL 33455093 (Mich. App. Jan. 29, 1999) (unpublished). Petitioner filed a delayed application for leave to appeal with the Michigan Supreme Court, which was denied. *See People v. Regelin*, 461 Mich. 899, 603 N.W.2d 642 (1999).

Petitioner, through counsel, subsequently filed a motion for relief from judgment with the trial court, raising claims of conflict of interest, insufficient evidence, improper jury instructions on conspiracy and the inability to conspire with a police agent, and the ineffective assistance of trial and appellate counsel. The trial court conducted a hearing on the conflict of interest issue.

At that hearing, the parties stipulated that prosecutor Tony Tague would testify that Petitioner providing supplier information might have lead to a deal but no actual offer was made.

Trial counsel Pedro Ferrar testified that he represented Joe Gonzales in January, 1996 in a Kent County drug case (unrelated to the present case) and in another case in February, 1997. Ferrar acknowledged that the Joe Gonzales he represented at that time was the same Joe

Gonzales named as an unindicted co-conspirator in Petitioner's case. Ferrar testified that he met Gonzales in 1991 and that Gonzales died in 1997. Ferrar testified that Petitioner informed him that the Joe Gonzales he had represented was the same one who was named as an unindicted co-conspirator in his case.

Ferrar also testified that he did not have any conversations with the prosecution regarding deals involving testimony against Joe Gonzales. He stated that Petitioner denied making admissions to police regarding his drug dealing. He also stated that Petitioner told him that he was not going to take any pleas, that the police did not have a case against him, and that he was not going to take any deals. Ferrar denied advising Petitioner to refrain from implicating Joe Gonzales because Gonzales had not been arrested in the case. Ferrar said that the only deal offered by the prosecution was for Petitioner to receive 10 to 20 years in Muskegon County and another 10 to 20 years in Kent County. Ferrar did not offer Petitioner's testimony against his supplier to the prosecution because Petitioner indicated that he was unwilling to go to prison for 20 years and he wanted to go to trial.

Ferrar testified that he warned Petitioner that he could face life imprisonment, as stated on the information. Ferrar knew that Petitioner wanted to testify at trial, but advised against it because he knew the risk to defendants, which included perjury and demeanor concerns, as well as Petitioner's cocaine use in this case. Ferrar testified that Gonzales being charged with conspiracy was "not even a consideration" and that he was loyal to Petitioner. Ferrar did not have a preference as to whether Gonzales was charged in Petitioner's case, but acknowledged that a conflict would have arisen had he been so charged. Ferrar did not recall Petitioner saying that he wanted to cooperate with police and give up his supplier, and denied discouraging

8

Petitioner from doing so.

Ferrar stated that Petitioner knew that he had represented Gonzales, but admitted that he did not inform the court or the prosecution of this fact. Ferrar could not recall whether he informed Petitioner that he was representing Gonzales in an unrelated Kent County case. Ferrar also testified that he presented the consecutive 10 to 20- year sentence offer to Petitioner and left it to him to decide whether to accept or reject the plea offer. Petitioner was not required to testify against anyone as part of the plea. Petitioner told Ferrar that the police wanted him to be a "snitch" and said that he would not do so. Ferrar testified that he never talked to Gonzales about Petitioner's case. He explained that his trial strategy was to attack the conspiracy and David Love's credibility, and stated that Gonzales was not a consideration.

Petitioner also testified at the hearing. Petitioner claimed that he told police that "Joe" was his supplier when arrested, but gave inconsistent testimony as to whether he provided a last name. According to Petitioner, Detective Wansten said that the police would work with him if he gave up his supplier, but he admitted that no specific deal was offered. Petitioner said that he and Ferrar discussed the named co-conspirators and Ferrar told him that he knew Joe Gonzales, that he had represented Gonzales and his sons, and that they "go way back." Petitioner claimed that he told Ferrar that he may want to cooperate with the police, but Ferrar preferred that he not do so. Petitioner also said that Ferrar told him that the plea offer was for delivery of 50 to 225 grams with a sentence of 10 to 20 years, but did not mention pleading to the Kent County charge. Petitioner admitted that Ferrar told him that the alternative to the plea was a life sentence, and claimed that he told Ferrar they should work something out. Petitioner testified that Ferrar advised him not to take a plea because he would have to implicate Joe Gonzales who was not

9

charged and there was no reason to do the police work for them.  Petitioner admitted that Ferrar did not say that the deal required any testimony against his supplier.  Petitioner claimed that he would have taken the plea of 10 to 20 years but for Ferrar's advice.  Petitioner admitted that Ferrar advised him that the possible penalties were mandatory life imprisonment or a double penalty of 20 to 40 years imprisonment.  He was also advised of the penalties at his arraignment.

Petitioner's mother, Peggy Eaton, testified that Petitioner was thinking of working with the police and taking a plea, but Ferrar advised against it because Petitioner would have to implicate Joe Gonzales who had not been charged.  Eaton testified that Ferrar said the plea offer was 10 to 20 years.  Eaton also said that Petitioner wanted to testify at trial, but Ferrar said no because he would have had to testify against Gonzales.  According to Eaton, Ferrar told them that he knew Gonzales but did not discuss any representation.

Muskegon County Prosecutor Victor Fitz testified that he presented a plea offer to Petitioner's counsel at the start of trial.  The offer required Petitioner to plead to a lesser charge and receive 10 to 20 years in the present case and to plead as charged in a Kent County drug case for a consecutive 10 to 20 years.  Fitz admitted that the police were interested in Petitioner's supplier at the time of his arrest.  He said there was a possibility of a better deal if Petitioner had offered testimony against his supplier, but explained that the possibility lessened with the passage of time.  Fitz could not recall if Ferrar said that he knew or represented Joe Gonzales.  Fitz stated that the parties discussed whether the trial court was required to impose a mandatory life sentence as opposed to a double sentence at sentencing.  He also recalled speaking to the Kent County prosecutor at the time of trial regarding Petitioner's plea opportunities.

Following the hearing, the trial court issued a written opinion denying the motion for

10

relief from judgment.  *See People v. Regelin*, No. 96-1-39927-FH (Muskegon Co. Cir. Ct. Feb. 26, 2002) (unpublished).  The court found that Petitioner had not established cause and prejudice for his failure to raise the conflict of interest claim on direct appeal.  The trial court did not specifically address Petitioner's other claims in its written opinion.

Petitioner filed a delayed application for leave to appeal with the Michigan Court of Appeals, which was denied "for failure to meet the burden of established entitlement to relief under MCR 6.508(D)."  *See People v. Regelin*, No. 247239 (Mich. App. June 2, 2003) (unpublished).  Petitioner filed an application for leave to appeal with the Michigan Supreme Court, which was similarly denied.  *See People v. Regelin*, 469 Mich. 971, 671 N.W.2d 881 (2003).  Petitioner's motion for reconsideration was also denied.  *See People v. Regelin*, 469 Mich. 971, 677 N.W.2d 27 (2004).

Petitioner, through counsel, thereafter filed the present habeas petition asserting the following claims as grounds for relief:

I.      Petitioner was denied his constitutional right to counsel by the conflict of interest of his counsel, Pedro Ferrer, who was also the attorney for the uncharged coconspirator.

II.     The evidence of the actions of Petitioner, as a matter of law, was insufficient to constitute conspiracy.

III.    The instructions to the jury on conspiracy were incorrect, misleading, and prejudicial.

IV.     The court denied due process by not instructing the jury that there can be no conspiracy with a police agent.

V.      Petitioner was prejudiced by ineffective assistance of counsel.

VI.     Petitioner was prejudiced by ineffective assistance of appellate counsel.

Respondent has filed an answer to the petition, asserting that the claims are procedurally

11

defaulted and/or lack merit.  Petitioner, through counsel, has filed a reply to that answer, as well

as supplemental authority in support of the petition.

## III.    <u>Standard of Review</u>

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, govern this case because Petitioner filed his

habeas petition after the AEDPA's effective date.  *See Lindh v. Murphy*, 521 U.S. 320, 336

(1997).  The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to
> any claim that was adjudicated on the merits in State court proceedings unless
> the adjudication of the claim--
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court
> proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule

that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of

facts that are materially indistinguishable from a decision of [the Supreme] Court and

nevertheless arrives at a result different from [this] precedent.'"  *Mitchell v. Esparza*, 540 U.S.

12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see

also Bell v. Cone*, 535 U.S. 685, 694 (2002).  "[T]he 'unreasonable application' prong of §

2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the

correct governing legal principle from [the Supreme] Court but unreasonably applies that

12

principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409.

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

Lastly, this Court must presume that state court factual determinations are correct. *See* 28 U.S.C. § 2254(e)(1). This presumption "applies to implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *Carey v. Myers*, 74 Fed. Appx. 445, 448 (6th Cir. 2003) (citing *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996)); *see also Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005) (the

13

presumption applies to "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact"). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

**IV.**   <u>**Analysis**</u>

    A.   <u>Procedural Default</u>

As an initial matter, Respondent contends that Petitioner's habeas claims concerning conflict of interest, the jury instructions, and the ineffective assistance of trial counsel are barred by procedural default because Petitioner failed to raise those claims on direct appeal of his convictions. Petitioner first presented the claims to the state courts in his motion for relief from judgment. The trial court denied the conflict of interest claim as procedurally defaulted under Michigan Court Rule 6.508(D)(3), finding that Petitioner had not shown good cause and actual prejudice for failing to raise the claim on direct appeal. The trial court did not specifically address the other claims. Both Michigan appellate courts denied leave to appeal "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)."

Federal habeas relief may be precluded on claims that a petitioner has not presented to the state courts in accordance with the state's procedural rules. *See Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977); *Couch v. Jabe*, 951 F.2d 94, 96 (6th Cir. 1991). A petitioner's procedural default in the state courts will preclude federal habeas review if the last state court rendering a judgment in the case rested its judgment on the procedural default. *Wainwright*, 433 U.S. at 85; *Coleman v. Mitchell,* 244 F.3d 533, 539 (6th Cir. 2001). In such a case, a federal court must determine not only whether a petitioner has failed to comply with state procedures, but also whether the state court relied on the procedural default or, alternatively, chose to waive the

14

procedural bar.  "A procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar."  *Harris v. Reed*, 489 U.S. 255, 263-64 (1989).  The last *explained* state court judgment should be used to make this determination.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991).  If the last state judgment is a silent or unexplained denial, it is presumed that the last reviewing court relied upon the last reasoned opinion.  *Id*.

Here, the Michigan Supreme Court relied upon Michigan Court Rule 6.508(D) in denying Petitioner leave to appeal.  That rule provides, in part, that a court may not grant relief to a defendant if the motion for relief from judgment alleges grounds for relief which could have been raised on direct appeal, absent a showing of good cause for the failure to raise such grounds previously and actual prejudice resulting therefrom.  *See* Mich. Ct. R. 6.508(D).  The state court's decision, while brief, was based upon an independent and adequate state procedural rule.  *See Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000).  Further, the record reveals that the trial court denied the motion for relief from judgment because Petitioner failed to establish cause and prejudice for not raising the claims on direct appeal of his conviction.  *Cf. Abela v. Martin*, 380 F.3d 915, 922-23 (6th Cir. 2004) (Michigan Supreme Court's reference to MCR 6.508(D) may not be clear procedural default when a lower court denies relief on the merits).

A state prisoner who fails to comply with a state's procedural rules waives the right to federal habeas review absent a showing of cause for noncompliance and actual prejudice resulting from the alleged constitutional violation, or a showing of a fundamental miscarriage of

justice.  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Gravley v. Mills*, 87 F.3d 779, 784-85 (6th Cir. 1996).  The "cause" standard in procedural default cases "requires the petitioner to show that some objective factor external to the defense impeded counsel's efforts to raise the claim in state court."  *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (citations omitted).  Such factors may include interference by officials, attorney error rising to the level of ineffective assistance of counsel, or a showing that the factual or legal basis for a claim was not reasonably available.  *Id*. at 493-94.

Petitioner alleges ineffective assistance of appellate counsel as cause to excuse his procedural default.  Petitioner, however, has not shown that appellate counsel was ineffective.  In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court set forth a two-pronged test for determining whether a habeas petitioner has received the ineffective assistance of counsel.  First, a petitioner must  prove that counsel's performance was deficient.  This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment.  466 U.S. at 687.  Second, the petitioner must establish that the deficient performance prejudiced the defense.  Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal.  *Id.*

With respect to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance.  *Id.* at 690.  The reviewing court's scrutiny of counsel's performance is highly deferential.  *Id.* at 689.  The court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  *Id.* at 690.

16

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

It is well-established that a criminal defendant does not have a constitutional right to have appellate counsel raise every non-frivolous issue on appeal. *See Jones v. Barnes*, 463 U.S. 745, 754 (1983). The Supreme Court has explained:

> For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the ... goal of vigorous and effective advocacy.... Nothing in the Constitution or our interpretation of that document requires such a standard.

Id. at 754. Strategic and tactical choices regarding which issues to pursue on appeal are "properly left to the sound professional judgment of counsel." *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990). Petitioner has failed to show that by omitting the claims presented in his subsequent motion for relief from judgment appellate counsel's performance fell outside the wide range of professionally competent assistance. Appellate counsel presented viable claims concerning the sufficiency of the evidence, prosecutorial misconduct, the jury instructions on aggregation of cocaine amounts, and sentencing on direct appeal. Petitioner has not shown that appellate counsel's strategy in presenting such claims and not raising other claims was deficient or unreasonable. Petitioner has failed to establish that he was denied the effective assistance of

17

appellate counsel.

Petitioner also asserts as cause the fact that he did not understand that a conflict of interest could arise from defense counsel's relationship with Joe Gonzales so as to present the conflict of interest claim in his supplemental pleadings on direct appeal.  The mere failure to recognize the factual or legal basis for a claim does not constitute cause for a procedural default.  *See Murray v. Carrier*, 477 U.S. 478, 486 (1986).  Further, the testimony at the evidentiary hearing established that Petitioner was well aware that defense counsel and Gonzales had a relationship that went "way back" and that counsel had represented Gonzales and his sons.  While Petitioner may not have known of counsel's concurrent representation of Gonzales in Kent County (on an unrelated charge) until further investigation by counsel on collateral review, Petitioner possessed some knowledge of facts which could support a conflict of interest claim at the time of trial and direct appeal, but failed to pursue the matter.  Petitioner has thus failed to establish cause to excuse his default.

This Court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default.  *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).  Nonetheless, even assuming that Petitioner has established cause to excuse his default, he cannot establish prejudice as his underlying claims lack merit.  *See* discussion *infra*.

Lastly, Petitioner has not established that a fundamental miscarriage of justice has occurred.  The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent.  *Schlup v. Delo,* 513 U.S. 298, 326-27 (1995).  "'[A]ctual innocence' means factual innocence, not mere legal

insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998). "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner has made no such showing. His conflict of interest, jury instruction, and ineffective assistance of trial counsel claims are thus barred by procedural default, lack merit, and do not warrant habeas relief.

      B.    <u>Conflict of Interest Claim</u>

Petitioner first claims that he is entitled to habeas relief because trial counsel, Pedro Ferrar, operated under a conflict of interest due to counsel's representation of unindicted co-conspirator Joe Gonzales, Petitioner's cocaine supplier, in an unrelated criminal matter in Kent County, Michigan. Petitioner claims that counsel's relationship with Gonzales caused counsel to advise Petitioner to forego cooperating with the authorities, to forego accepting a plea bargain, and to forego testifying on his own behalf at trial.

A criminal defendant is entitled to the effective assistance of counsel free from conflict. *See Holloway v. Arkansas*, 435 U.S. 475, 483-84 (1978). The United States Court of Appeals for the Sixth Circuit has summarized the difference between the typical ineffective assistance of counsel claim and a claim based on an allegation that counsel was burdened by a conflict of interest as follows:

> Conflict of interest cases involve a slightly different standard than that used in traditional ineffectiveness claims. *See* [*Thomas v. Foltz,* 818 F.2d 476, 480 (1987).] Where there is conflict of interest, "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Strickland*, 466 U.S. at 692, 104 S. Ct. 2052. Thus, when an actual conflict of interest exists, prejudice is presumed. *See id.* Prejudice is presumed, however, "only if the defendant

19

demonstrates that counsel 'actively represented conflicting interests' and that 'an
actual conflict of interest adversely affected his lawyer's performance.' "  *Id.*
(quoting *Cuyler v. Sullivan*, 446 U.S. 335, 345-50, 100 S. Ct. 1708, 64 L. Ed. 2d
333 (1980)).  Thus, while the rule is rigid, it is not a *per se* rule.  *See id.*

*United States v. Hall*, 200 F.3d 962, 965 (6th Cir. 2000).

In short, prejudice will be presumed upon a showing that a conflict existed which

adversely affected counsel's performance.  First, a petitioner must show that his attorney

"actively represented conflicting interests."  *Cuyler*, 446 U.S. at 350.  "[I]f the conflict is as to a

matter that is irrelevant or the conflict is merely hypothetical, there is no constitutional

violation."  *Moss v. United States*, 323 F.3d 445, 463-64 (6th Cir. 2003).  A petitioner must point

to specific instances in the record to suggest an actual conflict or impairment of his interests.

*See Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987).  A petitioner must "make a factual

showing of inconsistent interests and must demonstrate that the attorney made a choice between

possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to

one client but harmful to the other."  *Id.*  (internal quotation omitted).

Once a conflict of interest is established, a petitioner must demonstrate that the conflict

"actually affected the adequacy of [counsel's] representation."  *Cuyler*, 466 U.S. at 349-50.  The

standard requires "a choice by counsel, caused by the conflict of interest."  *McFarland v.

Yukins*, 356 F.3d 688, 706 (6th Cir. 2004).

Although the choice caused by the conflict does not have to be prejudicial in the
sense of causing the defendant to lose the case, . . . the reasonableness of
counsel's choice can be relevant as a factor in proving the choice was caused by
conflict.  A defendant or habeas petitioner does not have to produce direct
evidence, such as the lawyer's testimony, that the lawyer chose to do one thing
in order to accommodate a client's interests.  Causation can be proved
circumstantially, through evidence that the lawyer did something detrimental or
failed to do something advantageous to one client that protected another client's
interests.  "[B]oth taking an action and failing to take actions that are clearly

20

suggested by the circumstances can indicate an adverse effect." *Mickens v. Taylor*, 240 F.3d 348, 360 (4th Cir. 2001) (*en banc*).

*Id*.  The possible adverse affects from a conflict of interest may arise during trial or during pre-trial plea negotiations.  *See, e.g., Quintero v. United States*, 33 F.3d 1133, 1136 (9th Cir. 1994).

The *Cuyler* standard applies to cases involving concurrent representation, but not to cases involving successive representation.  *See Whiting v. Burt*, 395 U.S. 602, 618-19 (6th Cir. 2005); *cf Smith v. Hofbauer*, 312 F.3d 809, 817 (6th Cir. 2002) (refusing to extend *Cuyler* to ineffective assistance claim based on a conflict of interest arising from anything other than joint representation); *Benge v. Johnson*, 312 F. Supp. 2d 978, 994 (S.D. Ohio 2004) (refusing to apply the *Cuyler* standard outside the concurrent joint representation context).  Because the evidentiary hearing record indicates that attorney Ferrar was representing unindicted co-conspirator Joe Gonzales in an unrelated matter for at least part of the time during which he was also representing Petitioner in this case, the Court will apply the *Cuyler* standard.

To prevail on his conflict of interest claim under *Cuyler*, Petitioner must show:  (1) an actual and active conflict, and (2) the conflict adversely affected counsel's performance.  In this case, Petitioner has arguably met the first element by demonstrating that counsel Pedro Ferrar represented him while he represented Joe Gonzales (in an unrelated case) and that their interests could conflict if Petitioner cooperated with the authorities or testified and implicated Gonzales in his drug dealings.  *See United States v. Christakis*, 238 F.3d 1164, 1169-70 (9th Cir. 2001) (simultaneous representation of defendant and unindicted co-conspirator by same counsel could constitute an active conflict of interest).

Petitioner, however, has failed to show that an adverse affect on trial counsel's performance.  At the evidentiary hearing, Pedro Ferrar specifically testified that he was loyal to

21

Petitioner while representing him and that Gonzales being charged with conspiracy was "not even a consideration." Ferrar further testified that he never spoke to Gonzales about Petitioner's pending case. *See* Evid. Hrg. Tr., pp. 22, 26-27, 43.

Petitioner claims that Ferrar's performance was adverse because Ferrar advised him not to cooperate with police and not to implicate Gonzales. Ferrar, however, denied advising Petitioner not to cooperate with police. Ferrar explained that Petitioner denied making admissions to police regarding his drug dealing and said that the police did not have a case against him. Ferrar also stated that Petitioner told him that the police wanted him to be a "snitch" but he would not do so. *Id*. at pp. 14, 28, 34, 45.

Petitioner relatedly alleges that Ferrar advised him not to accept a plea bargain and/or failed to pursue a better deal by having him offer testimony against Gonzales. At the evidentiary hearing, however, Ferrar denied advising Petitioner not to take a plea. Ferrar said that he approached the prosecutor about a plea and was initially rejected. The prosecutor subsequently offered a plea in which Petitioner would receive 10 to 20 years in Muskegon County and a consecutive 10 to 20 years in Kent County. Petitioner was not required to testify against anyone as part of the plea. *Id*. at pp. 18, 81. Ferrar said that he presented the offer to Petitioner and left it to him to decide whether to accept or reject it. Ferrar explained that he did not offer Petitioner's testimony against his supplier to the prosecution because Petitioner said that he was unwilling to go to prison for 20 years and wanted to go to trial. *Id*. at pp. 16-20, 32. While there was some interest in identifying Petitioner's supplier at the time of his arrest, the parties agreed that the prosecution never offered a specific deal to Petitioner in exchange for his incrimination of Gonzales. *Id.* at pp. 14-15, 35, 48, 57, 88-89.

Petitioner further claims that Ferrar's performance was adverse because Ferrar advised him not to testify at trial (so he would not implicate Gonzales). Ferrar, however, explained that he advised Petitioner not to testify at trial because of risks, such as perjury, demeanor concerns, and Petitioner's cocaine use and admissions. *Id*. at p. 25, 40-41, 49. Ferrar said that his trial strategy was to attack the conspiracy and David Love's credibility, and he reiterated that Gonzales was not a consideration. *Id*. at p. 43.

In light of Ferrar's evidentiary hearing testimony, which this Court finds credible, Petitioner has not shown a causal connection between Ferrar's concurrent (but not joint) representation of him and Gonzales and Ferrar's performance in his case. Petitioner has thus failed to establish that an actual conflict of interest adversely affected trial counsel's performance. Habeas relief is therefore not warranted on this claim.

C.    <u>Insufficient Evidence Claim</u>

Petitioner next asserts that he is entitled to habeas relief because the prosecution presented insufficient evidence of conspiracy to support his conviction. Respondent contends that this claims lacks merit. This claim was raised on direct appeal and is not barred by procedural default.

In *Jackson v. Virginia*, 443 U.S. 307 (1979), the United States Supreme Court established that the standard of review for a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. Pursuant to 28 U.S.C. § 2254(d)(1), this Court must determine whether the state court's application of the *Jackson* standard was reasonable. In making this determination, the

Court must presume that the state court's factual findings are correct, unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Warren*, 161 F.3d at 360-61.

Under Michigan law, a conspiracy involves the mutual agreement or understanding, express or implied, between two or more persons to commit a criminal act or a legal act by unlawful means. *See* Mich. Comp. Laws § 750.157a; *People v. Anderson*, 418 Mich. 31, 36 (1983). Conspiracy may be established by circumstantial evidence and may be based on inference. *People v. McKenzie*, 206 Mich. App. 425, 428 (1994). Direct proof of agreement is not required, nor is it necessary that a formal agreement be proven. It is sufficient if the circumstances, acts, and conduct of the parties establishes an agreement in fact. *People v. Atley*, 392 Mich. 298, 310 (1974); *see also People v. Justice (after remand)*, 454 Mich. 334, 347 (1997). Michigan law recognizes "chain" conspiracies in which defendants may be convicted of conspiracy for their role in a drug chain where narcotics smugglers sell to middlemen who then sell to retailers. *See People v. Missouri*, 100 Mich. App. 310, 343, 299 N.W.2d 346 (1980); *see also People v. Meredith*, 209 Mich. App. 403, 412-13, 531 N.W.2d 749 (1995).

Delivery of more than 225 grams but less than 650 grams of cocaine requires proof of: (1) delivery of a substance containing cocaine; (2) the amount specified by statute; and (3) knowledge. *See* Mich. Comp. Laws § 333.7401(2)(a)(ii); *see also Justice,* 454 Mich. at 355. Under Michigan law, narcotic amounts delivered in small transactions may be aggregated where such conduct is shown to be part of a single scheme or plan to deliver the larger amount of narcotics charged. *See People v. Porterfield*, 128 Mich. App. 35, 41, 339 N.W.2d 683 (1983).

In concluding that sufficient evidence was presented to support Petitioner's conviction, the Michigan Court of Appeals stated:

> We have viewed the evidence in a light most favorable to the prosecutor and conclude that a rational trier of fact could find beyond a reasonable doubt that defendant was part of a "chain" conspiracy, with defendant's supplier, defendant, David Love, and John Workman sharing knowledge that the cocaine was being delivered for ultimate consumption by street users and agreeing to provide cocaine at various links along the chain to further this goal. *People v. Justice* (After Remand), 454 Mich. 334, 345-347, 355; 562 NW2d 652 (1997); *People v. Wolfe*, 440 Mich. 508, 515; 489 NW2d 748 (1992), *modified* 441 Mich. 1201 (1992); *People v. Porterfield*, 128 Mich. App 35, 41; 339 NW2d 683 (1983); *People v. Missouri*, 100 Mich. App 310, 343; 299 NW2d 346 (1980). Additionally, because the evidence supports an inference that the multiple deliveries of lesser amounts of cocaine were part of an ongoing criminal enterprise designed to distribute a significant amount of cocaine to street users for profit, these multiple transactions could be aggregated to establish the existence of the charged conspiracy. *Porterfield, supra.*

*People v. Regelin*, 1999 WL 33455093 at *1.

Having reviewed the record, this Court finds that the Michigan Court of Appeals' determination in this regard is reasonable. Petitioner argues that there was insufficient evidence to convict him of conspiracy on the basis of Wharton's Rule, which provides that "when two people are necessary to perform a proscribed act, they may not be prosecuted for conspiracy to perform it, for their combination adds nothing to their intent to commit the crime." *See People v. Davis*, 408 Mich. 255, 278, 290 N.W.2d 366 (1980); *see also Iannelli v. United States*, 420 U.S. 770, 773 n. 5 (1975). However, the evidence indicated that Petitioner also interacted with his supplier and other individuals. David Love's testimony established the existence of a conspiracy between himself (prior to the time he was a police informant), Petitioner, Petitioner's supplier, and other named co-conspirators, such as John Workman. Love's testimony about his discussions with Petitioner and the amount of drugs involved in their transactions provided sufficient evidence for the jury to find that Petitioner and the co-conspirators shared knowledge that the cocaine Petitioner obtained and supplied to others would

25

ultimately be delivered for consumption by street users.  *See, e.g., Malone v. Curtis*, 2000 WL 1137714, *8 (E.D. Mich. 2000) (denying habeas relief on similar insufficient evidence claim).

Additionally, Love's testimony, Petitioner's own admissions, and the police testimony established that Petitioner conspired with various individuals to deliver more than 225 grams of cocaine during the relevant time period in 1995 and 1996.  The testimony established that the ongoing transactions, which individually involved less than 225 grams of cocaine, were part of a larger plan to distribute more than 225 grams of cocaine.  Petitioner has presented no evidence to rebut the state court's findings nor does he demonstrate that the state court's conclusion that the facts establish a conspiracy to deliver the requisite amount of cocaine is unreasonable.

Petitioner's insufficiency of evidence claim attacks the credibility of David Love's testimony and the inferences that the jury drew from that testimony.  Such determinations, however, are not matters for federal habeas review.  In *Walker v. Engle*, 703 F.2d 959 (6th Cir. 1983), the United States Court of Appeals for the Sixth Circuit stated:  "A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  *Id.* at 970 (citing *Jackson,* 443 U.S. at 326).

Lastly, to the extent that Petitioner may be challenging the Michigan Court of Appeals' construction or application of state conspiracy law, he is not entitled to habeas relief.  "A claim that the state court misunderstood the substantive requirements of state law does not present a claim under § 2254.  A federal court may not issue the writ on the basis of a perceived error of state law."  *See Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002).  Given David Love's

26

testimony, the police testimony, and Petitioner's own admissions, this Court finds that the Michigan Court of Appeals' determination that a rational trier of fact could find the essential elements of conspiracy to deliver more than 225 grams but less than 650 grams of cocaine beyond a reasonable doubt was reasonable.  Petitioner is not entitled to relief on this claim.

     D.    <u>Jury Instruction Claims</u>

Petitioner also asserts that he is entitled to habeas relief because the trial court failed to properly instruct the jury on the conspiracy charge and failed to instruct the jury that a police agent may not be part of a conspiracy.

In order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *see also Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Coe v. Bell*, 161 F.3d 320, 329 (6th Cir. 1998).  If an instruction is ambiguous and not necessarily erroneous, it runs afoul of the Constitution only if there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.  *Estelle*, 502 U.S. at 72.  State law instructional errors rarely form the basis for federal habeas corpus relief.  *Id.* at 71-72.

The failure to give a defense instruction that is supported by the evidence does not automatically entitle a petitioner to habeas relief; the failure to instruct must have rendered the trial fundamentally unfair.  *See Maes v. Thomas*, 46 F.3d 979, 984-85 (10th Cir. 1995); *Nickerson v. Lee*, 971 F.2d 1125, 1137 (4th Cir. 1995).  A failure to instruct does not deprive a petitioner of fundamental fairness where the instructions as a whole adequately present the

defense theory to the jury.  *See Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995).  "An

omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the

law."  *Henderson*, 431 U.S. at 155.

Petitioner first claims that the trial court failed to instruct the jury that a conspiracy

required an agreement to deliver the cocaine to a third party and could not be based upon a mere

agreement between a buyer and seller.  The trial court instructed the jury in relevant part as

follows:

> Anyone who knowingly agrees with someone else to commit the crime of delivery of 225 grams or more, but less than 650 grams of a controlled substance, cocaine, is guilty of conspiracy.
>
> To prove the Defendant's guilt, the prosecutor must prove each of the following elements beyond a reasonable doubt: First, that the Defendant and someone else knowingly agreed to commit the crime of deliver of 225 grams or more, but less than 650 grams of a controlled substance, cocaine.  Second, that the Defendant specifically intended to commit or helped commit that crime.  Third, that this agreement took place or continued during the period from December of 1995 to October 9th of 1996.
>
> The crime of conspiracy to deliver 225 grams or more, but less than 650 grams of a controlled substance, cocaine, requires proof of specific intent.  This means that the prosecution must prove not only that the Defendant did certain acts, but that he did the acts with the intent to cause a particular result.  And for the crime of conspiracy to deliver 225 grams or more, but less than 650 grams of cocaine, this means that the prosecution must prove that the Defendant intended to commit or helped commit that crime.
>
> The Defendant's intent may be proved by what he said, what he did, how he did it, or by any other facts and circumstances in evidence.
>
> Now, let me define the crime of unlawful delivery of 225 grams or more, but less than 650 grams of a mixture containing a controlled substance, cocaine.  Now, this crime has the following elements: First, the Defendant delivered a controlled substance.  Second, the substance delivered was cocaine.  Third, that the Defendant knew he was delivering cocaine.  Fourth, that the substance was in a mixture that weighed 225 grams or more, but less than 650 grams.

28

Delivery means that the Defendant transferred or attempted to transfer the substance to another person knowing that it was cocaine and intending to transfer it to that person.

An agreement is the coming together or a meeting of the minds of two or more people, each person intending and expressing the same purpose. It is not necessary for the people involved to have made a formal agreement to commit the crime or to have written down how they were going to do it.

In deciding whether there was an agreement to commit a crime, you should think about how all the members of the alleged conspiracy acted and what they said, as well as all the other evidence.

* * *

Concerning the charge of conspiracy to deliver 225 grams of or more, but less than 650 grams of cocaine, you may add the separate amounts involved to determine the amount of cocaine which was actually a part of the conspiracy if you find that an ongoing conspiracy existed.

4/10/97 Trial Tr., pp. 529-33.

The jury instructions as a whole were adequate to protect Petitioner's rights. The trial court instructed the jury on the elements of conspiracy and the delivery of more than 225 grams but less than 650 grams of cocaine. In particular, the court instructed the jury that Petitioner and one or more person had to knowingly agree to deliver more than 225 grams but less than 650 grams of cocaine and the court defined delivery as the knowing and intentional transfer or attempted transfer of the cocaine to another person. The jury was properly instructed that Petitioner could be found guilty only if the jurors found that he committed the crime charged. Petitioner has not shown that the trial court omitted an element of the crime or that the jury instructions rendered his trial fundamentally unfair.

Petitioner also claims that the trial court failed to properly instruct the jury that he could not conspire with a police agent, such that a conspiracy conviction could not be based upon any agreement between Petitioner and David Love for their July 29, 1996 drug transaction. The

trial court, however, instructed the jury as follows:

> This Court should instruct you that once David Love has begun to be associated
> with the police department and acting under their instructions, that he is no
> longer a member of a conspiracy and can no longer participate as a member in a
> conspiracy.

4/10/97 Trial Tr., p. 538.  The next day, the trial court clarified its instruction:

> While it is true you may not consider the alleged delivery of cocaine form Mr.
> Regelin to Mr. Love on July 29, 1996, as proof of part of a conspiracy between
> Mr. Regelin and Mr. Love, you may consider the evidence of those acts you find
> were committed by Mr. Regelin to determine if there was proof of a conspiracy
> to deliver cocaine between Mr. Regelin and other persons.

4/11/97 Trial Tr., p. 550.

The trial court's instructions were sufficient to inform the jury that Petitioner could not

be convicted for a conspiracy between himself and David Love relative to the July 19, 1996

transaction.  The jury was well aware of Petitioner's defense to the charges.  The Court must

presume that the jury followed the court's instructions.  *See Richardson v. Marsh*, 481 U.S. 200,

206 (1987); *see also United States v. Olano*, 507 U.S. 725, 740 (1993).  Where, as here, the

instructions as a whole adequately convey the defense theory of the case to the jury, a petitioner

is not entitled to habeas relief based on the trial court's failure to give a specific instruction.

*See, e.g.*, *Rodriguez v. Young*, 906 F.2d 1153, 1166 (7th Cir. 1990).  Petitioner has not

established that the jury instructions, read as a whole, rendered his trial fundamentally unfair.

Furthermore, even if the trial court erred in instructing the jury, any such error was

harmless.  For purposes of federal habeas review, a constitutional error that implicates trial

procedures is considered harmless if it did not have a "substantial and injurious effect or

influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993);

*see also O'Neal v. McAninch*, 513 U.S. 432, 445 (1995) (habeas court should grant petition if it

has "grave doubt" about whether trial error had substantial and injurious effect or influence upon jury's verdict). This Court does not believe that any omissions in the jury instructions had a substantial or injurious effect or influence in determining the jury's verdict. As discussed *supra*, the evidence at trial was more than sufficient to support a finding of a "chain" conspiracy to deliver more than 225 but less than 650 grams of cocaine. Habeas relief is not warranted on these jury instruction claims.

> E.   Ineffective Assistance of Trial Counsel Claims

Petitioner next alleges that he is entitled to habeas relief because trial counsel was ineffective for failing to appeal the pretrial ruling which amended the information to include the July 29, 1996 transaction, for advising Petitioner that he could receive a life sentence or the lesser sentence of double punishment upon conviction, for failing to request the afore-mentioned jury instructions, and for advising Petitioner that the prosecution could introduce evidence of a prior conviction if he testified.

In *Strickland v. Washington,* 466 U.S. 668 (1984), the United States Supreme Court set forth a two-pronged test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. 466 U.S. at 687. Second, the petitioner must establish that the deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

With respect to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance.

31

*Id.* at 690.  The reviewing court's scrutiny of counsel's performance is highly deferential.  *Id.* at 689.  The court must recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  *Id.* at 690.

To satisfy the prejudice prong under *Strickland*, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is one that is sufficient to undermine confidence in the outcome.  *Id.*  "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result."  *McQueen v. Scroggy*, 99 F.3d 1302, 1311-12 (6th Cir. 1996) (quoting *Strickland*, 466 U.S. at 686).

Petitioner first contends that counsel was ineffective for failing to appeal the pretrial ruling which amended the information to include the July 29, 1996 transaction.  This contention lacks merit.  Counsel may have reasonably decided that such an appeal would be futile.  In fact, the Michigan Court of Appeals addressed the amendments to the information on direct appeal and upheld the trial court's decision.  The court reasoned that although that transaction could not be used to establish a conspiracy between Petitioner and David Love, it could be used to establish a conspiracy between Petitioner and his supplier or other parties.  *See People v. Regelin*, 1999 WL 33455093 at *3.  Given this decision, Petitioner cannot establish that he was prejudiced by defense counsel's conduct in failing to appeal the pretrial ruling.

Petitioner next claims that counsel was ineffective for advising Petitioner that he could

receive a life sentence or the lesser sentence of double punishment upon conviction.  This

contention lacks merit.  The record reflects that Petitioner was charged as a repeat drug offender

pursuant to a statute which would require a mandatory life sentence upon conviction and was

charged as a second habitual offender which would result in a double punishment upon

conviction.  Trial counsel so advised Petitioner.  The information also stated these facts.  *See*

Evid. Hrg. Tr., p. 21.  Petitioner admitted that counsel advised him that the possible penalties

were life imprisonment and double punishment and he knew he faced a life sentence upon

conviction as a repeat drug offender.  *Id*. at pp. 63, 68, 70.  The fact that counsel's argued for

double punishment under the habitual offender provision rather than a life sentence under the

repeat drug offender provision does not mean that counsel misunderstood the penalties.  The

record indicates that Petitioner was well aware that he faced a life sentence.  Petitioner has not

shown that counsel's performance in this regard was deficient or that he was prejudiced thereby.

Petitioner next asserts that counsel was ineffective for failing to request the afore-

mentioned jury instructions.  Given the Court's determination that those claims lack merit,

Petitioner cannot establish that he was prejudiced by counsel's conduct.  Further, the Court

notes that trial counsel did request that the court instruct the jury that Petitioner could not

conspire with David Love during the time he was operating as a police agent.  *See* 4/10/97 Trial

Tr., pp. 537-38.

Lastly, Petitioner asserts that counsel was ineffective for advising him not to testify and

for stating that the prosecution could introduce evidence of a prior conviction if he testified.

Petitioner has not rebutted the presumption that trial counsel's conduct in advising him not to

testify constituted sound trial strategy.  *See, e.g., Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir.

33

2002) (decisions as to what evidence to present and whether to call certain witnesses are matters of trial strategy).  At the evidentiary hearing, counsel testified that he advised Petitioner not to testify because of concerns about perjury, demeanor, and his cocaine use.  *See* Evid. Hrg. Tr., pp. 25, 40-41.  Moreover, Petitioner has not established that he was prejudiced by counsel's conduct as he has not shown that his testimony would have likely affected the outcome at trial.  Petitioner has thus failed to satisfy the requirements of *Strickland* and is not entitled to habeas relief on his ineffective assistance of counsel claims.

     F.    <u>Ineffective Assistance of Appellate Counsel Claim</u>

Lastly, Petitioner claims that appellate counsel was ineffective for failing to raise the foregoing issues (other than the sufficiency of evidence issue) before the state courts on direct appeal of his convictions.  Given this Court's determination that the foregoing issues lack merit, however, Petitioner cannot establish that appellate counsel was ineffective under the standards set forth in *Strickland, supra*.  Habeas relief is not warranted on this claim.

**V.**    <u>**Conclusion**</u>

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition.

Accordingly,

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED WITH PREJUDICE**.

 

                                    ____s/Bernard A. Friedman_____
                                    BERNARD A. FRIEDMAN
                                    UNITED STATES DISTRICT JUDGE

DATED: ___February 24, 2006_____